**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| WILLIE VEASY,<br><br>                    Plaintiff,<br><br>            v.<br><br>CITY OF PHILADELPHIA, and Officers<br>MARTIN DEVLIN, PAUL WORRELL,<br>EDWARD ROCKS, FRANK<br>JASTRZEMBSKI, MANUEL SANTIAGO,<br>JOHN DOE(S), Individually and as police<br>officers for the City of Philadelphia,<br><br>                    Defendants. | Civil Action No.<br><br><br>**COMPLAINT &**<br>**JURY DEMAND** |

## I.   PRELIMINARY STATEMENT

1.      In 1993, Plaintiff Willie Veasy was wrongfully convicted and sentenced to life in prison for a murder that took place while he was working as a dishwasher at a restaurant eight miles from the crime scene. In 2019, after he had spent 27 years wrongly imprisoned, he was exonerated after an independent review by the prosecution concluded he was likely innocent and that police misconduct had led to his wrongful conviction.

2.      Mr. Veasy's conviction for a crime he did not commit was neither an accident nor an isolated instance of police misconduct. Rather, Mr. Veasy, like many other young Black men from Philadelphia in the period 1985–1995, was the victim of Philadelphia Police Department homicide detectives who routinely engaged in egregious investigative misconduct to close cases.

1

3.      Despite his documented alibi and many other indications of his innocence, Defendants targeted Mr. Veasy based on a highly problematic identification from an unreliable and biased witness. Knowing the flawed identification alone would be insufficient, Defendants coerced and fabricated a "confession" that became the centerpiece of the evidence used to convict Mr. Veasy—just as these same detectives had done to convict other innocent men in other cases from the same time period.

4.      Plaintiff brings this action under 42 U.S.C. § 1983 seeking redress for the extraordinary misconduct of Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s), who fabricated evidence, deliberately concealed exculpatory evidence, and subjected Mr. Veasy to the denial of due process of law and a fair trial.   The conduct of the officers was the result of policies, practices, customs, and deliberate indifference on the part of the City of Philadelphia, including the failure to properly train and supervise officers assigned to investigate homicides, and the failure to take disciplinary and remedial action against the defendants and other police officers who commit serious misconduct and abuses of authority.

## II.   JURISDICTION

5.      This action is brought pursuant to 42 U.S.C. § 1983.   Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(1), (3), (4) and the aforementioned statutory provision.

## III.   PARTIES

6.       Plaintiff Willie Veasy is a resident of Philadelphia, Pennsylvania and at all times relevant to this action was in the Eastern District of Pennsylvania.

7.      Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and operates, manages, directs, and controls the Philadelphia Police Department

which at all times relevant to this action employed Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s).

8.      Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s) ("the defendant officers") were at all times relevant to this action police officers or detectives for the Philadelphia Police Department acting under color of state law.   The defendant officers are sued in their individual capacities.   Defendant Jastrzembski is also sued in his supervisory capacity.

9.      At all relevant times, all defendants were acting in concert and conspiracy and their actions deprived the plaintiff of his constitutional and statutory rights.

10.      At all times relevant to this Complaint, all defendants acted under color of state law.

## IV.   FACTUAL ALLEGATIONS

11.      On January 24, 1992, shortly before 10:00 p.m., a group of young Black males in a red car arrived at the corner of West Russell Street and North Seventh Street in Philadelphia, an area known for drug activity. A passenger, a young Black man wearing a red coat with a fur collar, bought marijuana from Efrain Gonzalez, who was selling on the corner, before returning to rob Mr. Gonzalez and shoot him. This same man in the red coat then shot John Lewis, who had been standing down the block next to his friend Andrew Bagwell. Mr. Gonzalez survived, but Mr. Lewis did not.

12.      Willie Veasy had absolutely nothing to do with the shooting or robbery. From 6 p.m. to nearly 2 a.m. that evening he was working as a dishwasher during a busy shift at a Houlihan's restaurant in Jenkintown, eight miles (or a twenty-minute drive) away.

13.     A squad of Philadelphia Police Department detectives was assigned to the case, led by Defendant Jastrzembski and assisted by Defendants Devlin, Worrell, Rocks, Santiago, and Doe(s).   Defendant Jastrzembski, as lead investigator, supervised the other detectives and officers involved in the investigation, was responsible for assigning responsibilities and reviewing relevant police reports including but not limited to witness interviews, notes, forensic evidence, and entries in Activity Sheets.

14.     The police arrived shortly after the shooting to find and interview a number of witnesses who had been at the scene. Witnesses described how the shooter had arrived and left in a red or maroon car, and how the same group of men had been selling jewelry or watches on the street earlier that evening.

15.     None of the witnesses who had viewed the shooter from the street ever identified the innocent Mr. Veasy as the shooter, and their contemporaneous descriptions pointed away from him. For example, the witnesses suggested the shooters were not from the neighborhood, while Veasy was from the neighborhood and was known to many of the witnesses.

16.     Andrew Bagwell told police he was with Mr. Lewis when Lewis was shot, and that the shooter was a little taller than himself; Bagwell was 5'6." Mr. Veasy, by contrast, is 6'3." Bagwell also explained how he had encountered the same group of Black men about half an hour before the shooting trying to sell him jewelry on the street.

17.     That evening police interviewed Mr. Gonzalez at the hospital. Gonzalez described the robbery and shooting and said that he saw a red two-door car occupied by three Black males. The man who robbed and shot him came out of the passenger side. Gonzalez did not see anyone else get out of the car. The man stole $10.00 in cash and twenty-four bags of marijuana valued at

4

$10.00 each. Gonzalez said he would be able to recognize his assailant if he saw him again. Gonzalez never identified Willie Veasy as the shooter.

18.     The police also interviewed Denise Mitchell, who claimed to have been watching from her second-floor window when Gonzalez was shot. There were reasons to doubt the reliability and accuracy of Mitchell's account from the outset.   First, she reported that she had viewed the shooting at night, from an elevated position far from the scene.   Second, she had seriously impaired vision (her eyesight was 40/100), and gave a description of the shooting that conflicted in significant ways from that of witnesses who were at the scene. Third, the account Mitchell gave police after the shooting contradicted the account she gave in a 911 call earlier that evening, when she claimed there were two shooters and they were wearing black clothes. Fourth, Mitchell claimed that the suspects, who she identified only as "Pee Wee" and "Man," had committed the murder years earlier of her brother in law, Verdell "Dale" Solomon. The detectives ignored Mitchell's obvious bias, and never bothered to confirm that two different men had previously been convicted of the Solomon murder.

19.     Despite suggesting the nicknames Pee Wee and Man to the police the night of the murder, police learned that same night Mitchell had told others at the scene that it was not Pee Wee but a person named "Midnight" from 7th and Venango that was the shooter. This exculpatory information—contradicting her ultimate testimony that Pee Wee was the shooter—was hidden from the prosecution and defense. The investigating detectives either failed to follow up on this suggested perpetrator or failed to record the results of their investigation in the file.

20.     Cassandra Hayward, Mitchell's sister, told police that she was on the phone with Mitchell when the shooting happened. Hayward directly contradicted her sister's account,

5

reporting that Mitchell had told her a) she was outside when the shooting happened and almost got shot herself, b) there were two men shooting out of the windows of a red car, and c) there was no mention by Mitchell that she recognized, by nickname or otherwise, any occupants of the red car, including the shooter.

21.     Two weeks after the murder, Mitchell directed police to a person in the neighborhood, Marshall Hall, who lived a block from her and who she claimed knew the identity of the shooter. When police then interviewed Hall, he identified David Simms as the shooter. Police then interviewed Simms, who denied any involvement, and ceased any further investigation into this lead. While Simms's statement denying any knowledge of the shooting was recorded and placed in the file, the exculpatory evidence—that Hall had identified Simms as the shooter, and that Mitchell had provided the information that ultimately led to Simms—was affirmatively hidden from the prosecution and defense.

22.     Although Mitchell had now pointed to at least three separate and distinct sets of people as the possible perpetrators in the shooting, and had demonstrated her serious limitations and lack of reliability as an unbiased eyewitness, police still went back to her to make an identification. Approximately three weeks after the murder, Defendant Jastrzembski showed Mitchell a photo array containing Mr. Veasy's picture. Despite having told detectives that she had known Pee Wee all her life, Mitchell did not identify anyone in the array. Jastrzembski did not document this interaction with Mitchell.

23.     The surviving shooting victim, Mr. Gonzalez, had a far better opportunity to view the shooter than Ms. Mitchell, and told the police that he would recognize both the shooter and

the other males in the car. However, there is no record of any identification procedure with Mr. Gonzalez in the police file. The logical inference is either that detectives showed Mr. Gonzalez the photo array that included Mr. Veasy's photo and failed to record the exculpatory results of that identification procedure (as Defendant Jastrzembski did the first time he showed the array to Mitchell), or the detectives intentionally failed to conduct any identification procedure with Mr. Gonzalez because they knew a fair identification procedure would not lead to an identification of Mr. Veasy.

24.     Despite her failure to identify Mr. Veasy—whom she said she knew—three months later, on May 23, 1992, Detective Dominic Mangoni, along with two other detectives, showed Mitchell the same array shown to Mitchell by Defendant Jastrzembski, and from which she had not made any identification.

25.     According to Detective Mangoni, Mitchell identified Mr. Veasy as Pee Wee, said that he was the man who shot Lewis, and said that she had known him all her life.

26.     Mitchell later testified that she pointed out several people in the photo array, including Mr. Veasy, as people she recognized.

27.     On June 9, 1992, based solely on the inconsistent, questionable, and unreliable account of Denise Mitchell, the defendant officers caused Mr. Veasy to be arrested on charges of murder and related offenses.

28.     Willie Veasy was arrested at home in the early morning hours and transported to the police station.   At the time of his arrest, he had been out drinking all night, was still noticeably intoxicated, and had slept for barely an hour.

29.     Mr. Veasy was interrogated by Defendants Devlin, Worrell, and Rocks. Despite the availability of video or audio equipment, the interrogating detectives did not record the interrogation. Nor did they advise Mr. Veasy of his rights under *Miranda v. Arizona*.

30.     Instead, while Mr. Veasy was handcuffed to a chair, one of the defendant detectives slapped him in the face. The detectives then told Mr. Veasy they knew he had committed a murder and pressured him to confess. Mr. Veasy repeatedly and truthfully asserted his innocence and told the interrogating detectives that he was working at Houlihan's Restaurant at the time they claimed he had committed the murder.

31.     The detectives refused to accept Mr. Veasy's innocence and made no effort to confirm his alibi. Instead, they pressured him over a protracted period to confess to the crime and provide information about how it was committed. Because he was innocent, all he knew about the crime was limited information from rumors that had circulated in the neighborhood. Mr. Veasy could only repeat these limited rumors he had heard. Despite continued threats, deception and coercion—including an attempt by one of the defendant detectives to kick Mr. Veasy in the groin—Mr. Veasy continued to truthfully tell the defendants that he was innocent and he did not know anything beyond rumors about the crime.

32.     Finally the interrogating detectives told an exhausted Mr. Veasy they had written down his exculpatory statement and, once he signed it, he would be "out of there," which Mr. Veasy understood to mean they would let him go home. Mr. Veasy signed the written document without reading it.

33.     The "confession" is a nine-page, handwritten document written in Q-and-A format, purporting to be a verbatim record of non-leading questions posed by detectives and

narrative answers by Mr. Veasy, in which he allegedly admits responsibility for the shooting murder.   This "confession" is a fabrication.   Mr. Veasy did not provide the statements detectives attributed to him; rather, he consistently told detectives he was innocent. Nor could Mr. Veasy volunteer specific details about the crime because he had not been there and did not know anything beyond basic rumors that had circulated in the neighborhood; any accurate details in the confession came from the detectives.

34.     It was only after Mr. Veasy had signed the fabricated confession that the interrogating detectives presented him with a *Miranda* form, which he similarly signed under the misimpression if he signed he would be permitted to go home.

35.     Mr. Veasy stood trial on these charges before a jury commencing February 3, 1993.

36.     The principal evidence presented by the prosecution at trial was the fabricated "confession" of Mr. Veasy.

37.     Based on Defendants' misrepresentations about the circumstances of the confession, the fabricated "confession" was introduced against Mr. Veasy. Defendants falsely claimed this confession accurately represented what Mr. Veasy had said, and that he had voluntarily confessed to the shooting.

38.     In addition, the prosecution presented the flawed identification testimony of Denise Mitchell. Although Ms. Mitchell identified Mr. Veasy as the man who shot Lewis and Gonzalez, she admitted that it was dark on the night of the shooting; there were street lights across from her house, but none of the houses on Russell Street had lights mounted on them; and that her vision was 40/100, which made it difficult to see at night, and at a distance.

9

39.     On re-direct examination, the prosecutor asked Mitchell whether she had "any problems" with Mr. Veasy, and Mitchell testified that she did not.

40.     The defendant officers knew that Mitchell had reported the same night as she first implicated Mr. Veasy that she believed (falsely) that he had been involved in her brother-in-law's murder, but they concealed this information from counsel and the court.

41.     Although apparently available as a witness, Efrain Gonzalez was not called to testify. Any exculpatory identification procedures with Mr. Gonzalez were concealed from the prosecution or defense.

42.     Mr. Veasy asserted his innocence and presented an alibi defense. The defense presented several witnesses to establish that Mr. Veasy was working the night of the shooting at the Houlihan's restaurant in Jenkintown, at least a twenty-minute drive from the 700 block of Russell Street in Philadelphia.   Houlihan's employees verified Mr. Veasy's timecard showing that he punched in at 5:59 PM on Friday, January 24, 1992, and punched out at 1:52 AM the next morning—covering not only the shooting, but the time in which the shooters were alleged to have been in the neighborhood earlier in the evening. Mr. Veasy's coworkers made clear they would have noticed if Mr. Veasy had been absent during such a busy shift.

43.     The jury deliberated over four days before finding him guilty of second-degree murder on February 19, 1993—thus sparing Mr. Veasy the death penalty.

44.     Willie Veasy was sentenced to imprisonment for life.

45.     Unbeknownst to Mr. Veasy at the time, during the same period that the investigating detectives were engaging in serious misconduct to cause his wrongful conviction—including fabricating a confession they falsely attributed to him, coercing his

10

signature, and deliberately deceiving prosecutors and the courts by hiding exculpatory
evidence—these same detectives were engaged in a pattern of similar misconduct across other
serious investigations in Philadelphia. This pattern included:

a. **Anthony Wright** (CP-51-CR-1131582-1991).   In 1991, PPD homicide
detectives including Devlin, Santiago and Jastrzembski framed Mr. Wright for
the rape and murder of an elderly woman—a crime he did not commit. In a
striking parallel to this case, Devlin and Santiago interrogated Mr. Wright for
hours and, when he would not confess—because he was innocent—wrote out
a fabricated "confession," in Q-and-A format, falsely attributing statements to
Mr. Wright confessing to the crime, and then coerced him to sign it. PPD
detectives including Jastrzembski also engaged in other serious investigative
misconduct, including planting physical evidence falsely implicating Mr.
Wright and coercing and fabricating inculpatory statements from other
witnesses. Based on this fabricated evidence, Mr. Wright was wrongly
convicted in 1993 of the rape and murder. After spending nearly twenty-five
years in prison, in 2016 Mr. Wright was exonerated by DNA evidence that
identified the true perpetrator of the rape and murder.

b. **Andrew Swainson** (CP-51-CR-0431331-1988). In 1989, PPD homicide
detectives including Santiago framed Andrew Swainson for a murder he did
not commit. Santiago used direct suggestion to compel a single eyewitness
(and original suspect who had been arrested for the shooting moments after it
occurred, covered in blood and running from the scene) to implicate the

innocent Swainson. Santiago then lied and claimed the identification had been from a non-suggestive photo identification procedure. Based on this fabricated and coerced evidence, Mr. Swainson was wrongly convicted of the murder in March 1989 and sentenced to life imprisonment. Mr. Swainson has recently been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 30 years for a crime he did not commit.

c.  **Walter Ogrod** (CP-51-CR-0532781-1992). In 1992, Devlin and Worrell coerced and fabricated a false confession from Mr. Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when Det. Devlin went to work. Devlin and Worrell interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Mr. Ogrod has recently been exonerated, the charges *nolle prossed*, and he was released from prison after serving more than 25 years for a crime he did not commit.

d.  **Shaurn Thomas and Mustafa Thomas** (CP-51-CR-0916842-1993).   In 1992, Devlin and Worrell framed brothers Shaurn and Mustafa Thomas for a 1990 shooting murder they did not commit. In October 1992, Devlin and Worrell coercively interrogated John Stallworth—including hitting him with a

telephone book and squeezing his testicles—to coerce him to confess to a role in the murder and, on direct instruction from the detectives, falsely implicate Shaurn and Mustafa Thomas in the crime. All the facts in the statement were provided by Devlin and Worrell, and falsely attributed to Stallworth. Devlin and Worrell then coerced and fabricated a matching statement from John Stallworth's brother, William Stallworth. In 1994, both Thomas brothers were wrongly convicted based on this fabricated and coerced evidence and were sentenced to life imprisonment. After spending 25 years in prison, Shaurn Thomas was exonerated in 2017; subsequently, Mustafa Thomas's conviction was also vacated and charges against him dismissed.

e. **Carlos Hernandez/Tonez** (CP-51-CR-0302131-1991). A woman and her boyfriend were robbed at gunpoint by two men and her boyfriend was shot. Defendant Devlin coerced a key witness, Juan Sanchez, into falsely implicating Carlos Hernandez and another man, including by holding Sanchez in custody and interrogating him for three days, without food or water; hitting him several times, and denying him use of the bathroom so that he had to urinate on the floor. After coercing Mr. Sanchez's statement, Devlin coerced Mr. Hernandez into providing a statement implicating Ed Williams, including by handcuffing him to a chair and holding him without water, food, or use of a bathroom and punching him in the face and pressing his foot on Mr. Hernandez's crotch until he relented and signed the statement. Later it was

proved that Mr. Williams was in a secured drug treatment facility at the time of the crime.

f. **Jackie Combs Jr.** PPD detectives, including Devlin, coerced four young witnesses into testifying against Mr. Combs for a 1990 murder that he denies committing. One of those witnesses, just 15 at the time, has told reporters that she felt "it's my fault, because I changed my story, saying this man killed this guy [and] knowing he didn't do it." The witnesses, who gave varied accounts of the killing, have explained that their statements were the result of physical and verbal abuse by detectives. Devlin's affidavit of probable cause omitted material information, including that all the witnesses reported it was a murder-suicide until they were pressured to change their statements.

g. **Percy St. George** (CP-51-CR-1012571-1993). In investigating a 1993 murder, Defendant Santiago obtained a statement from a witness who, because there were warrants out for his arrest, signed the statement under a friend's name: David Glenn. As trial approached, PPD officers picked up the actual David Glenn. At the station, Santiago coerced the real David Glenn into signing a new false statement saying he saw the crime and identifying Mr. St. George from a sham photo array prepared by Det. Santiago. After David Glenn testified in an October 1993 hearing regarding Santiago's misconduct and disavowed the statement Santiago had coerced him to sign, Santiago notified the Court and the Commonwealth of his intention to assert his 5th Amendment right against self-incrimination to avoid having to testify about

14

his actions in that case.    Shortly after receiving this letter from Santiago's counsel, the prosecution dismissed all charges against St. George, but Santiago remained with the PPD through September 1996 without discipline or reprimand.

h. **James Dennis.**   Santiago and Jastrzembski investigated James Dennis for a 1991 murder of a high school student he did not commit. When interrogated after his arrest, Dennis provided an alibi—that he had been on a bus near the time of the murder—and said an acquaintance, Latanya Cason, had seen him on the bus and could verify. When Jastrzembski and Santiago interviewed Cason, they created a statement that falsely suggested Cason had seen Dennis at a later time, and thus that Dennis was providing a false alibi. Jastrzembski and Santiago then buried the timestamp receipts from Cason's errand that proved their lie, hiding it from the prosecution and defense. In addition, Jastrzembski tampered with or destroyed physical evidence he had seized that was exculpatory for Dennis, and Santiago coerced another witness to give a statement falsely implicating Dennis in the crime. Based on this misconduct, Dennis was wrongly convicted and sentenced to death. In 2016, the U.S. Court of Appeals, sitting *en banc*, affirmed the District Court's decision overturning Dennis's conviction and granting federal habeas relief based on multiple *Brady* violations. District Judge Anita Brody ruled that PPD homicide detectives "covered up evidence" that "pointed away" from Dennis' guilt, suppressed key witness statements, and staged sham suspect lineups.

15

46.     In addition to this pattern of contemporaneous, similar misconduct by the very detectives who caused Mr. Veasy's wrongful conviction, there was also a broader pattern of similar misconduct in the PPD over this time period. This included:

a. **Chester Hollman.** PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness, Jones, who had no knowledge of the crimes, to provide a false statement implicating the innocent Hollman; they typed out a statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

b. **Terrence Lewis.** PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Mr. Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding key exculpatory evidence that would have demonstrated Mr. Lewis's innocence. In 2019, Mr. Lewis was exonerated after he had spent 21 years wrongly imprisoned.

c. **Donald Ray Adams** (CP 51-CR-0743812-1991). Adams was charged and convicted in the 1990 murders of Darryl Patterson and Thomas Winn. PPD detectives coerced a false statement from an alleged witness, Donna Benjamin, implicating Adams and Adams was convicted based almost entirely

on this evidence. Benjamin subsequently recanted in 2007 and the Philadelphia Court of Common Pleas granted post-conviction relief based on the testimony of Benjamin that the detectives threatened her with incarceration, promised that her open criminal charges would be dismissed, and offered her financial and other material support for her testimony. The detectives ignored the fact that other witnesses provided physical descriptions of the assailant as over six feet tall, thin, light skinned and in his 20s. Mr. Adams was 5'4", 200 pounds, dark skinned and in his 30s. Moreover, there was evidence pointing towards another "Don Ray" (Don Ray Bennett) who lived in the neighborhood, fit the description of the assailant, and whose family had been in disputes with the victims. Indeed, Ms. Benjamin stated that it was Don Ray Bennett in her recantation. At a 2011 retrial, Adams was acquitted of all charges. In a subsequent civil suit for malicious prosecution, the matter was settled and Adams received compensation for his wrongful conviction.

d.   **John Miller.** In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a false and fabricated statement PPD detectives had coerced from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998 and testified that detectives had threatened him and fed him details until he implicated Miller. Nevertheless, detectives falsely denied their misconduct and Miller was convicted in 1998. In the 10 years following Miller's conviction, investigation repeatedly

unearthed new evidence demonstrating Miller's innocence, including additional evidence corroborating Williams's assertion that the statements attributed to him by the police were false and coerced. Nevertheless, the PPD failed to investigate. In 2019, the federal district court vacated Miller's conviction and the Philadelphia District Attorney's Office subsequently dismissed all charges, stating that Miller had "met his burden of proving his innocence."

e. **Eugene Gilyard and Lance Felder.** In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During a cold case investigation over two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Gilyard and Felder. For example, after witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting Williams's home multiple times, cursing and shouting at him, and pushing on his head while pointing to Felder's photo. Similarly, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and

Felder reached a settlement with the City for compensation for their wrongful convictions.

47.     Mr. Veasy fought for years to prove his innocence.    His efforts were ultimately aided by evidence of patterns of similar misconduct in the PPD uncovered during two separate federal civil rights lawsuits involving other innocent suspects who were victims of the detectives' coercive conduct, Anthony Wright and Shaurn Thomas. Both lawsuits, which were settled for substantial damages, alleged a pattern and practice of coercive interrogation in homicide cases from the early 1990s, including the Veasy prosecution.

48.     During the course of the *Wright* and *Thomas* litigations, the City produced several homicide files and court transcripts related to cases investigated by Defendants Devlin, Worrell, Jastrzembski, Santiago, and others in the early 1990s.    Each file contains allegations of similar abusive conduct by the detectives in the pursuit of a statement from a suspect or witness.    These cases have the following issues in common with Mr. Wright's and Mr. Veasy's false confessions:

    a.  Demonstrably false confessions containing facts that completely contradict eyewitness statements and physical evidence;

    b.  Confessions or statements in which the subject names accomplices who were never charged due to the existence of an alibi or lack of corroboration evidence (also demonstrating the falsity of the statements); and

    c.  Confessions or statements in which the interviewees relate that they were physically and/or mentally coerced at the Philadelphia Police Homicide Division by Defendants Devlin, Worrell, and other homicide detectives.

49.     During the *Wright* litigation, Mr. Veasy gained access to the John Lewis homicide file for the first time, and discovered evidence of exculpatory information the defendants had buried for 20 years, including evidence that Denise Mitchell had pointed to two sets of other suspects—"Midnight" and David Simms.

50.     Based on newly discovered exculpatory evidence in his case, as well as the newly disclosed evidence of the pattern of serious investigative misconduct by PPD detectives including Devlin, Jastrzembski, Worrell and Santiago, Mr. Veasy and his attorneys sought postconviction relief and the Conviction Integrity Unit (CIU) of the Philadelphia District Attorney's Office started an investigation.

51.     Ultimately, based on this newly developed evidence of Mr. Veasy's innocence, the CIU joined in the request to have Mr. Veasy's conviction vacated on October 9, 2019.

52.     On the same day, the District Attorney's Office, having found that Willie Veasy was "likely innocent" of the murder of John Lewis, *nolle prossed* all charges.

53.     Willie Veasy was released from prison the same day, having served 27 years in prison for a crime he did not commit.

54.     As a result of the actions and inactions of the defendant officers, Willie Veasy spent 27 wrongly imprisoned, causing him substantial harms including but not limited to the loss of liberty, confinement under deplorable conditions, severe emotional harms, loss of income and other economic damages.

55.     For many years dating back to the 1970's, and continuing well beyond the time of the investigation of Mr. Lewis's murder, the City of Philadelphia had in force and effect a policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in particular,

using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; conducting improper identification procedures; concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects, and arrestees.

56.     This policy, practice, or custom involved the use of various techniques to coerce incriminating statements, including without limitation: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use or threat of physical violence; coercing or deceiving suspects or witnesses into signing false confessions or fabricated facts; authoritative assertions of a suspect's guilt, including without limitation confrontation with false inculpatory evidence; and providing false assurances—including to juveniles and other vulnerable people that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

57.     These practices were well known to the City of Philadelphia and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

58.     Various cases demonstrate that this misconduct was pervasive within the Philadelphia Police Department at time of Mr. Veasy's 1993 trial, and, upon information and belief, the misconduct described below was committed with the knowledge of Homicide Unit and PPD supervisors or because of their deliberate indifference to this misconduct.

59.     At the time of the investigation and prosecution of Mr. Veasy in 1992–1993, the PPD had a policy, practice, or custom of detaining, arresting, and interrogating suspects and witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits, and/or by the use of impermissibly deceptive practices. These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or her attorney sought the right to consult.

60.     This practice, as exemplified by the investigations in Mr. Veasy's case and those detailed above, continued for years due to the deliberate indifference of the PPD and City of Philadelphia to this policy, practice, and custom. In 2014, after further proof of this policy, practice, and custom was provided to the PPD, the District Attorney, and the City, the PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

61.     During the 1980's and early 1990's, and concurrent with the investigation of this case, there was within the PPD a pattern, practice, and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.   On three separate occasions in the 1980's courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices. *See Cliett v. City of Philadelphia*, C.A. No. 85-1846 (E.D. Pa. 1985) (consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); *Spring Garden Neighbors v. City of Philadelphia*, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in a homicide investigation); *Arrington v. City of*

22

*Philadelphia*, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

62.     Thereafter in the late 1980's and early 1990's a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of the PPD, including the disregard of credible complaints to IAD and District Attorney, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

63.     This systemic and unconstitutional practices and customs in the 39th District were investigated by the FBI and prosecuted by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the homicide with which Mr. Veasy was charged, a Court in the Eastern District of Pennsylvania entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. *See NAACP v. City of Philadelphia*, C.A. No. 96-6045.

64.     In summary, at the time of the investigation and prosecution of Willie Veasy, the PPD had a practice, policy, and custom of:

> a.    Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements,

impermissible deception, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

b. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

c. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

d. Ignoring systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

e. Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of persons such as Mr. Veasy.

65.     At the time of the investigation and prosecution of Willie Veasy, and for many years before and thereafter, the PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. Excessive and chronic delays in resolving disciplinary complaints;

b. A lack of consistent, rational and meaningful disciplinary and remedial actions;

c. A failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. The PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e. The PPD discipline, as practiced, was incident-based rather than progressive; repeat violators were not penalized in proportion to the number of violations;

f. The conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g. A global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h. Serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i. A lack of an effective early warning system to identify, track, and monitor "problem" officers;

j. IAD often failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.   IAD failed to acknowledge the disproportionate and extreme use of force used

by police officers in the investigation of citizen complaints and failed to

properly categorize the police officers' misconduct in those cases as an

impermissible use of force.

## CAUSES OF ACTION

**COUNT I: 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law and Denial
of a Fair Trial Under the Fourteenth Amendment**
*Against All Individual Defendants*

66.   Plaintiff incorporates by reference all of the foregoing paragraphs.

67.   Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s), acting

individually and in concert, and within the scope of their employment with the PPD, deprived

Willie Veasy of his clearly established constitutional right to due process of law and to a fair trial

by:

**Count A    Fabrication:** The defendant officers fabricated evidence including but not

limited to an inculpatory statement the defendants falsely claimed to have been made by Mr.

Veasy when, in fact, Mr. Veasy had plainly asserted his innocence of the charges; and

**Count B    Deliberate Deception:** The defendant officers deliberately deceived counsel

and the court by concealing and/or suppressing relevant and material evidence, including but not

limited to a) handwritten notes showing that Mitchell told two other eyewitnesses that persons

other than Willie Veasy had committed the murder, b) Philadelphia Police Homicide Activity

Sheet documenting that Mitchell told police the shooter frequented the area of 5th and

Westmoreland Streets and that Mitchell named a person in the neighborhood who lived a block

from her whom she claimed knew the identity of the shooter; c) Philadelphia Police Homicide

Activity Sheet revealing that police interviewed a witness at Mitchell's behest who told police that David Simms (residence 630 W. Clearfield Street) was the shooter; and d) evidence that Denise Mitchell believed that Mr. Veasy had been involved in the murder of her brother-in-law, and thus had a motive to falsely implicate Mr. Veasy in the shooting of Lewis and Gonzalez

68.     The individual defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Veasy's clearly established constitutional rights.   No reasonable officer in 1992–1993 would have believed this conduct was lawful.

69.     Defendants' acts and omissions, as described above, were the direct and proximate cause of Mr. Veasy' injuries.   Defendants knew, or should have known, that their conduct would result in Mr. Veasy's wrongful trial at which he faced the death penalty, and the harms he sustained as a direct result.

### COUNT II: 42 U.S.C. § 1983 Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments
*Against all Individual Defendants*

70.     Plaintiff incorporates by reference all of the foregoing paragraphs.

71.     Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s), acting individually and in concert with malice and knowing that probable cause did not exist to prosecute Mr. Veasy for the shooting of Lewis and Gonzalez, intentionally caused Mr. Veasy to be arrested, charged, and prosecuted for those crimes, thereby violating Mr. Veasy's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

72.     The defendant officers, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in an arrest and prosecution without probable cause.

73.     The defendant officers performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Veasy's clearly established constitutional rights. No reasonable officer in 1992–1993 would have believed this conduct was lawful.

74.     The prosecution finally terminated in Mr. Veasy's favor on October 9, 2019, when his convictions were vacated and all charges dismissed..

75.     The acts and omissions by the defendant officers described in the preceding paragraphs were the direct and proximate cause of Mr. Veasy's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Veasy.

### COUNT III:   42 U.S.C. § 1983 Civil Rights Conspiracy
*Against All Individual Defendants*

76.     Plaintiff incorporates by reference all of the foregoing paragraphs.

77.     Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s), acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Willie Veasy of his clearly established Fourth Amendment right to be free from a malicious prosecution and Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

78.     In furtherance of the conspiracy, the defendants engaged in and facilitated numerous overt acts, including, but not limited to the following:

a.  Fabricating evidence, tampering with evidence, and using physical force, coercion, improper deception, and/or threats to obtain incriminating statements;

b.  Deliberately deceiving counsel and the court by concealing and/or withholding relevant, material, and exculpatory evidence.

79.  Defendants' acts and omissions, as described above, were the direct and proximate cause of Willie Veasy's injuries.   Defendants knew, or should have known, that their conduct would result in Mr. Veasy's malicious prosecution and denial of due process and a fair trial.

### COUNT IV: 42 U.S.C. § 1983 Failure to Intervene
*Against All Individual Defendants*

80.  Plaintiff incorporates by reference all of the foregoing paragraphs.

81.  By their conduct, under color of state law and within the scope of their employment with the PPD, Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s) had opportunities to intervene on behalf of Mr. Veasy to prevent a malicious prosecution and the deprivation of liberty without due process of law, and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

82.  The defendants' failures to intervene violated Mr. Veasy's clearly established constitutional rights not to be subjected to a malicious prosecution, and to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourth and Fourteenth Amendments.   No reasonable police officer in 1992–1993 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, tampering with evidence, deliberately deceiving counsel and the court by concealing critical evidence, and causing Mr. Veasy to be subjected to an unfair trial, were lawful.

29

83.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Veasy's injuries.   Defendants knew, or should have known, that their conduct would result in Mr. Veasy's unfair trial.

## COUNT V: 42 U.S.C. § 1983 Supervisory Liability Claim
### *Against Defendant Jastrzembski*

84.     Plaintiff incorporates by reference all of the foregoing paragraphs.

85.     The individual defendants acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by Defendant Jastrzembski, both in this case and as a matter of practice and custom.

86.     Defendant Jastrzembski acted recklessly and/or with deliberate indifference to Mr. Veasy's constitutional rights by failing to adequately train, supervise, and discipline the PPD homicide detectives assigned to this investigation, including Defendants Devlin, Worrell, Santiago, Rocks, Jastrzembski, and Doe(s), thereby allowing and causing these detectives to deprive Mr. Veasy of his clearly established constitutional rights, including his rights to due process of law and to a fair trial under the Fourteenth Amendment, and his right to be free of a malicious prosecution under the Fourth Amendment.

87.     Defendant Jastrzembski was personally involved in the investigation of Mr. Veasy, and directly supervised the investigative acts taken by himself and other detectives and officers.

88.     The reckless and deliberately indifferent conduct of Defendant Jastrzembski violated the clearly established duty to supervise, and no reasonable police supervisor in 1992–1993 would have believed that reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

30

89.     Defendant Jastrzembski's acts and omissions, as described above, were the direct and proximate cause of Mr. Veasy's injuries.   Defendant Jastrzembski knew, or should have known, that his conduct would result in Mr. Veasy being subjected to a denial of due process and an unfair trial.

## COUNT VI: 42 U.S.C. § 1983 Municipal Liability Claim
### *Against Defendant City of Philadelphia*

90.     Plaintiff incorporates by reference all of the foregoing paragraphs.

91.     The City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Veasy's arrest and trial, and for many years preceding and following the trial, a policy, practice, or custom of unconstitutional conduct in homicide and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, threats, deception, and suggestion; tampering with evidence; planting evidence; and concealing and/or withholding exculpatory evidence.

92.     The City of Philadelphia, by and through its final policymakers, knew or should have known that Defendants Devlin, Worrell, Rocks, Jastrzembski, Santiago, and Doe(s) had engaged and were continuing to engage in patterns of misconduct as described above that were unlawful and violated generally accepted police practices, and that this misconduct caused and was continuing to cause violations of the constitutional rights of persons, including Willie Veasy, who as a result suffered substantial harms.

93.     Policymakers for the City of Philadelphia had actual or constructive notice of the above practices, policies, and customs, but repeatedly failed to undertake any meaningful investigation into charges that homicide detectives were using coercive and impermissibly

deceptive techniques in interviews and interrogations, concealing exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects, and arrestees; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

94. The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Mr. Veasy's trial for murder, and the other injuries and damages set forth in this Complaint.

## COUNT VII: DAMAGES
### *Against All Defendants*

95. Plaintiff incorporates by reference all of the foregoing paragraphs.

96. The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent, and/or malicious actions and omissions of all defendants caused Mr. Veasy to be compelled to stand trial facing the death penalty, be wrongly convicted, and spend 27 years in prison for a crime he did not commit, which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, loss of income, economic harms, and other associated damages.

## COUNT VIII: PUNITIVE DAMAGES
### *Against All Individual Defendants*

97. Plaintiff incorporates by reference all of the foregoing paragraphs.

98. The defendant officers acted willfully, deliberately, maliciously and/or with reckless disregard of Mr. Veasy's constitutional rights and punitive damages should therefore be awarded against the individual defendants.

WHEREFORE, Plaintiff Willie Veasy requests the following relief:

a.   Compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.   Punitive damages to Plaintiff and against all individual Defendants, jointly and severally, in an amount to be determined at trial;

c.   Pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. §1983 claims;

d.   Any and all other relief to which Plaintiff may be entitled; and

e.   A jury trial as to each defendant and as to each count.

_____
Paul Messing
Pa. ID No. 17749
David Rudovsky
ID No. 15168
Kairys, Rudovsky, Messing, Feinberg, & Lin, LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106


_____
Peter Neufeld*
Emma Freudenberger*
Neufeld Scheck & Brustin, LLP
99 Hudson Street, Eighth Floor
New York, NY 10013
(212) 965-9081
*Attorneys not yet admitted to the Eastern District of Pennsylvania; applications to practice *pro hac vice* forthcoming

33